Good morning. Is it Raboose? If you're one of my cousins, yes. In our family in Minnesota, we say Raboose, Your Honor. Raboose. Oh, yeah. I'm sorry. And you may proceed. You have an easy last name, Chief Judge Riley. Good morning. I am Dwight Raboose. I represent Appellants Thomas Tormey, Jr. and the company he created at St. Jude's Instruction, Tormedco. There seem to be three contending positions before the Court on this appeal from the J. M. O. L. ruling of Chief Judge Davis, those being the position taken by the Court itself in making that ruling, the position advocated by Tormey and Tormedco, and then the position taken in the briefing by St. Jude Medical, which in important respects seeks to distance itself from the reasoning and conclusions of the District Court. For the reasons we explain in our brief, we think there are apparent reasons why St. Jude seeks alternative grounds of affirmance because we think the record here is abundantly clear that Judge Davis took it upon himself, we suggest improperly, to resolve a number of contentious fact disputes against my client, and then, more seriously perhaps, made some errors of law in his instructions to the jury, which we think then impacted his analysis of the case. I'm going to turn first to the first breach defense having to do with the breaches of contract. We argued to the jury were committed by St. Jude because quite obviously were there not a breach, the counterclaim itself would be moot. Fundamentally, I would suggest that the District Court in its decision reflects a basic misunderstanding of the trial testimony as to the manner in which Mr. Tormey sold as one of the most successful cardiac sales representatives in the industry. As we point out, during his time at Medtronic, he wasn't just good, he was great, selling around $10 million of cardiac products a year. He was able to do that because Medtronic supplied him with a team of what are called clinical or technical support specialists. As Mr. Tormey testified at trial, when you go to physicians and hospitals with a cardiac product, one of their expectations at the get-go is, if the cardiac rep is not going to be available to cover an implant procedure, are there a team of trained specialists around him who can cover the procedure? That's especially important to them because a salesperson in this industry or a support specialist actually robes up, goes into the operating room, stands beside the implanting surgeon and makes actual product recommendations. Use this defibrillator rather than that, this pacemaker rather than that, and when you do that, here are the leads you need to attach to the products. That is why when he negotiated his contract with St. Jude, he specifically insisted that the representative agreement include a clear obligation on St. Jude's part to go out and hire, not borrow, but hire at least one clinical support specialist as soon as practicable, and after that was achieved, there was a cost-sharing agreement between Mr. Tormey and the company where they would split the cost of bringing in additional support specialists. He was under a one-year non-compete agreement. During that non-compete period, he consistently lobbied his business superiors to have that support. He was not provided with that support. Coming out of the non-compete, he continued to do so, and as the record reflects, he was not even offered technical support specialists until two years into the contractual relationship in the late fall of 2003. So fundamentally, we suggest here that the court, when it said there was no breach, because there was always enough support for the levels at which Mr. Tormey sold, got this backwards. It is analogous, I suppose, to hiring someone because he is an especially proficient hunter, promising him as the hunter you're going to supply him with a good rifle and ammunition. He comes aboard, you don't supply him with the ammunition or the gun, and then you fault him and terminate him because he doesn't bag any game. That is what we suggest happened in this case. Now, as to the quota obligations in this contract, while St. Jude seeks to trumpet the fact that they paid him a great deal of money, the contract was of seven-year duration, and the quote-unquote guarantee obligation extended only for the first several years of the contract. Even then, however, St. Jude was protecting itself by including language in the contract that should Mr. Tormey sell below target levels, they could dock his compensation substantially. And along the way, that is what they eventually did. All right, moving off the there was no breach analysis by Judge Davis, two other things he pins his decision on in finding there was no first breach. First, he says, well, eventually St. Jude did provide a specialist in late 2003, and this was somehow curative of the problem that had been going on for two years. In making that suggestion, I would suggest for the reasons I've just described, that is too little too late to put Mr. Tormey in a position to sell successfully. But secondly, it does not even meet the contract which requires that they hire somebody. What they did in November of 2003 was to offer Mr. Tormey access to a specialist supporting another St. Jude sales rep who was actually competing against Mr. Tormey in the same market, who lived at a distance, and Mr. Tormey, for the reasons he explained in his emails to the company, found that inherently unworkable. The other thing Judge Davis said, however, is that there was a waiver of this contract requirement to provide the support specialist. And I submit that an examination of the actual record puts that to rest. In September of 2003, Mr. Tormey did, in fact, provide a provisional suggestion to his St. Jude managers that while they continue to wrestle over a variety of quota levels, this conversation, by the way, was taking place after the point in the sales year where St. Jude, by contract, was already obligated to have set sales levels for Mr. Tormey. He put that out there. We'll park the technical support issue and work through that and we can reach an agreement on other things. What he got back from St. Jude was an email recapitulating conversations they'd had with him over the past months, talking about sales level, but completely ignoring the suggestion that they put aside the technical support specialist obligation. And in that same response in September of 2009 or 2003, they told him for the first time that they were actually going to set about finding him the support specialist that he'd been asking for for two years. Let me ask this. Looking at this, it certainly came to my mind. And my question is, did you argue this to the jury or at any time that St. Jude was, well, St. Jude could have been seriously trying to get Mr. Tormey to come work for them or they could just be taking him off the playing field for their other representatives. Was there any of that? We wanted to, Your Honor, as we point out in the brief. There are other cases where St. Jude has been the subject of rep lawsuits because reps were hired under similar agreements, quickly terminated on what eventually proved to be pretextual grounds. So we had sought discovery here seeking to inquire into how St. Jude was treating other sales reps during this period of time. It was our theory of the case that they were changing the business strategy. These guys were very expensive, that they were in fact motivated to cherry pick people from the opposing team and were relatively indifferent as to whether they sold for St. Jude. They just didn't want them selling for Boston or Medtronic or the competition. So hiring Tormey achieved that. We were hoping to develop a record through discovery that would enable a full argument about that to the jury. Magistrate Leung gave us very narrow discovery access on that point. And so we made a very limited argument that was more in the nature of a hypothetical than something we could ground in the facts. But we've always been of the belief that they had buyer's remorse. They were paying Mr. Tormey a lot. They would prefer, as they eventually did, to shift his responsibilities to an employee salesperson who they would compensate at lower levels. The waiver argument we talk about in the brief, we don't think it rises to a level of waiver. And if you're going to apply a waiver in this case, we think the evidence is far stronger, given the exchange of correspondence between Mr. Tormey and the company, that in the early months of 2004, which is where they shrank their defense in this case, and he admittedly was not selling at high levels because he was caring for his terminally ill wife, the company gave him a pass on that, encouraging him to look after her as his first priority. All right. As to the counterclaim, the district court did assume, for the sake of argument, that there was an oral agreement made between Mr. Tormey and the company in 2004, in which they agreed to walk away from their obligations to one another. Mr. Tormey could keep a $650,000 interest-free loan he'd been granted in 2001, provided that he honored his non-compete agreement and did not pursue the company for breach of contract. Well, he did not pursue the company for breach of contract. He did, as we told the jury, honor his non-compete at a time where he was desperate for new employment, sent no resumes, interviewed with nobody, until the non-compete period expired. There are all kinds of close fact issues in this case. We think there are arguments on both sides of the case as to the reasonability of Mr. Tormey's reliance on the oral agreement that the district court assumed, but I would direct this court's attention to the one hook on which Judge Davis hung his decision granting judgment against the counterclaim. That being his conclusion, we suggest erroneously against the facts that Mr. Tormey conceded in his trial testimony that when he received a letter in October of 2008 from a junior collection counsel at St. Jude, that he should have known the jig was up. Examining that testimony, as we explain in our brief, under cross-examination by Mr. Fox, what Mr. Tormey actually answered was that when he received a second letter in May of 2012, after his own attorney had protested to St. Jude and attempted to explain why the obligation was not owned, he began to believe that the company might pursue him. Even at that juncture, however, in May of 2012, we have more than a year and a half that goes by before the company sues Mr. Tormey in an effort to collect the loan. And so we suggest under very conventional analysis that he was legitimately entitled to wait as long as he did, and even if he had an understanding that he might have to sue in May, you are still within the two-year window of time provided under the contractual limitations period. A final word on what we would ask this court to do. Again, we believe there are lots of close-fat questions here that probably explains why the jury was hung in this case. But we suggest that one of the contrary to what we suggest is clear Minnesota law regarding oral contracts and their effects in credit agreements improperly instructed the jury that the oral agreement was a modification of a contract. We suggest the Petschke decision by Judge Tunheim establishes that not to be true. And once you establish that it's not a modification, what you then do is go to the Minnesota case law that teaches you that the applicable standard is the normal preponderance of the evidence standard for finding an oral agreement. So we would ask, Your Honors, that in addition to reversing the decision and remanding for trial, that your decision include a specific instruction based on the case authority we provide that in the retrial the jury be properly instructed, and in that event we're confident of a plaintiff's verdict. With the Court's permission, I will reserve the balance of my time. Okay, thank you. Mr. Fox? Thank you, Your Honor. May it please the Court, Counsel. Your Honor, the standard of review in this case, of course, is whether or not Judge Davis correctly granted judgment as a matter of law on the grounds that there was no sufficient evidentiary basis in the record to support any claim by Mr. Tormey, taking the record in light that's most favorable to Mr. Tormey. And what the light most favorable to Mr. Tormey means is whether or not there could be a reasonable inference based on any evidence in the case that is not based on assumption or speculation. And the fact of the matter is, is that the trial record in this case was unequivocal and solid in every respect that there was absolutely no oral agreement between Mr. Tormey and St. Jude Medical, and that Mr. Tormey, at the latter part of his sales relationship with St. Jude Medical, had waived, expressly waived any issue with respect to TSS support. Now, I want to address the issue of the alleged oral agreement first. Mr. Tormey was sued for violation of the promissory note, and the only defense that was raised with respect to the alleged promissory note was that he had this oral agreement in which the company had allegedly agreed that he would not have to pay the promissory note back at the time that he was terminated in May of 2004. The record is that any such oral agreement ever took place. The only statement in the record that would support the existence of any such alleged oral agreement is the naked testimony of Mr. Tormey himself, which was asserted for the first time in the counterclaim with respect to the answer in this case that was filed in February of 2011. All of the other evidence in the case, all of the objective, contemporaneous evidence in the case is consistent with the fact that he was terminated in May of 2004, that there was no discussion with Mr. Gantz of any kind about any type of oral agreement. All of the documentary evidence after the termination of the agreement in May of 2004, for six consecutive years after that, Mr. Tormey continued to receive annual notices of imputed interest from St. Jude Medical, and with the consultation of his accountant, he continued to report the imputed interest with respect to the promissory note. So in addition to the fact that all of the objective evidence is inconsistent with the existence of any such oral agreement, and in addition to the fact that Mr. Tormey raised it for the first time in the litigation, his own behavior was directly contrary to the existence of any type of oral agreement. And Mr. Tormey testified at trial. He was confronted with all of these imputed interest letters there, Plaintiff's Exhibit No. 15, and he was explicitly asked on the record whether or not those were inconsistent with his position that there was an oral agreement with St. Jude Medical, and he conceded on the record that they were inconsistent. So as far as any type of reasonable reliance on an oral agreement is concerned, as of December of 2005, and for every solitary year thereafter until the time that the lawsuit was commenced, he received one of those letters, and he knew that he had to report imputed interest, which would have been inconsistent with the cancellation of the note. Secondly, Exhibit No. 51 demonstrates that in the summer of 2007, and this is in our supplemental appendix, these are notes from Mr. Tormey's accountant, and during the course of those communications in the summer of 2007, the question of the treatment of the promissory note came up, and the note, which is that supplemental appendix No. 88, and I simply want to emphasize two points there, is the accountant says that we need to continue to review St. Jude's loan status with Corp and Tormey. Mr. Corp was his lawyer. It's still being negotiated, and Mr. Tormey testified at trial that he never told his accountant that this note had apparently or allegedly been canceled or terminated or forgiven in any way. This note from the accountant goes on to say, Tom Tormey was made aware of the fact in a July 11, 2007 meeting that this could be income to him depending on settlement results, and as the Court is aware, it's a basic rule that debt forgiveness gives rise to ordinary income, so that in the event that the note were forgiven, Mr. Tormey would have been obligated to report that on his tax returns, and he never reported that $650,000 on his tax return. So I would respectfully submit to the Court, when the entire record is looked at as a whole, all of the objective contemporaneous evidence is completely inconsistent with the existence of an oral agreement, and dispositively, Mr. Tormey's testimony, his behavior, and his conduct itself in consultation with his lawyers and in consultation with his financial advisors demonstrates that no such agreement took place. The only point that I wanted to make with respect to the accountant's note is, obviously it begs the question that if there were an oral agreement that had been entered into in May of 2004, there wouldn't have been any reason for him to be telling his accountant in July of 2007 that he was still negotiating the arrangement with St. Jude Medical. And the record was clear that not only did Mr. Tormey never tell his accountant that he allegedly had canceled the note or settled the note, he also testified and was perfectly clear that there were never any subsequent communications of any kind with St. Jude Medical after the latter part of May of 2004. So again, the question arises, Mr. Tormey was a sophisticated individual, he was involved in a major business transaction with St. Jude Medical under his independent sales rep agreement, he admittedly receives these 1099s and letters of imputed interest every year until the time that the lawsuit is commenced, and not at any point in time does he ever communicate in any way with St. Jude Medical and say, I think there's a mistake here, this has been resolved, this note has been canceled, why do you continue to send me these notices, and so forth. I do want to address one point also that Mr. Rebus raised on this issue. He also, I think, misstates and overstates what Judge Davis's position was with respect to the October 2008 letter from Ms. Gordon. And I would simply like to point out to the Court a couple of things. In his order granting judgment as a matter of law, Judge Davis surveys all the evidence in the case, and one of the points that he raises is the fact that Mr. Tormey himself on cross-examination admitted that when he received the letter, he knew that there was a problem, he at least at that point in time knew that there was no resolution or settlement of the promissory note. And the way that that testimony goes, and it's taken out of context in the appellant's brief, it's pages 597 through 601 of the trial transcript. And this is the way that the issue was framed at trial and the way that Judge Davis addresses it in his order. Mr. Tormey received the first letter from House Counsel in October of 2008 making a demand for repayment of the promissory note. His testimony was that he then communicated with his lawyer, Mr. Corr, to address the issue. And at trial he testified that during the course of those communications he obviously would have notified his counsel of all of the reasons why he believed or all of the reasons why he thought there was some type of an oral agreement or no obligation to repay the note. Nothing's ever in writing, of course. So Mr. Tormey never writes anything, the lawyers never write anything. Instead they telephone St. Jude Medical. And in response to those communications to St. Jude Medical, Ms. Gordon writes a second letter. And she goes back and says, you told me that you don't think that there's any obligation to repay the note because the sales representative agreement quotas were never properly put in place. And in connection with that, she sends back all of the e-mails and she sends back all of the so forth that demonstrate that Mr. Tormey, in fact, actively negotiated the reduced quotas in the fall of 2003. He executed all of the forms and he agreed to all of those quotas. There's nothing said about any other issue. There's nothing said about walk-away agreements, TSS support, availability of support in the territory. There's nothing. The only thing that the letter addresses is the question about whether or not he agreed to the quotas. And he conceded at trial that he had actively negotiated and accepted those reduced quotas. Well, let's see. I guess what you've been telling us is runs counter to what Mr. Raybus says in page 14 of his reply brief. You don't, you know, St. Jude does not try to defend the courts, jail, O.L. finding that Tormey conceded that he knew that St. Jude would not honor the October 30 agreement. And then he says, in lieu of endorsing the district court's analysis, St. Jude turns to a grab bag of alleged facts. Is that what you've just been doing? Sorting a... No, Your Honor. We haven't been going to an alleged grab bag of facts. And there's two things. Number one, we certainly do completely endorse the correctness of Judge Davis's ruling with respect to granting J-Mall in this case. Well, sure you do. But on that particular point, do you? On that particular point, we absolutely do. The reason that we raised the other issues is they were threshold issues with respect to the applicability of the credits. It's easy, for me at least, not to my colleagues, to get lost in the facts of the case. What basically was Mr. Tormey's theory of the case as outlined in his opening statement to the jury? This is what St. Jude promised me and this is what they did not give me. Was it that simple? No. Actually, Your Honor, what his opening statement was is that we had this agreement and I had an oral agreement with Mr. Gantz that was entered into on May 17, 2004. And interestingly, we raised this in the brief, is that during the course of the trial, Mr. Tormey conceded as he had to because the email exchange on that date demonstrated that there was no agreement or any discussion about the disposition of the promissory note. Had there been an oral agreement, what would it have said or what did he claim it said? What he claimed was that he said that in exchange for not suing St. Jude Medical under the sales rep agreement, you're going to forgive the promissory note and I won't have to repay it. All this talk about not providing an assistant is what? Beside the point? I think it's completely beside the point only with respect to one issue. They did raise the question as a waiver, that there was an alleged waiver that was a defense to repayment of the promissory note. And again, we addressed this in the brief, Your Honor, but on September 17th, the email from Mr. Tormey is unequivocal that he's saying that we're going to put aside the issue of the technical service support in exchange for greatly reduced quotas that came nowhere close to the kinds of expectation of sales that they had anticipated at the time that they entered into the agreement in September of 2001. And that email, Your Honor, is identified at our supplemental appendix. It's plaintiffs exhibit 11 and number 27, and that's the email that appears at supplemental appendix 45 and 47. And Mr. Tormey's lawyer elicited the testimony himself at the time of trial that Mr. Tormey had put aside that issue. And I want to emphasize the point that Mr. Arrebus just made the argument that Judge Davis found that he had waived that requirement with respect to the performance of the representative agreement. And Judge Davis did make statements to that effect in his Jamal Water, because it was clear and it was unrebutted on the result of the TSS issue, they had demonstrated that there was no causation with respect to Mr. Tormey's inability to meet those very modest quotas between November of 2003 and May of 2004 that resulted in his termination. So the actual outcome, although Judge Davis does discuss the agreement to the reduced quotas in exchange for waiving the TSS issue, his actual ruling at the conclusion of the order is that there was no demonstration of any causation that prevented Mr. Tormey from making those sales, which obviously would have prevented his termination. I want to make two other comments, and I want to address Judge Riley's question that he asked Mr. Arrebus. There was a suggestion, and Mr. Arrebus said it again, that somehow or other there was this plan that St. Jude Medical was trying to hire competitive reps to take them off the playing field. There was never any evidence of that. There was never even a whiff of that during trial. That was, again, part of the pyrotechnics to try to confuse things, to raise speculative issues that weren't supported in any way in the record. And the suggestion itself is silly. St. Jude Medical entered into a sales representative agreement, another agreement with Mr. Tormey, in September of 2001, in which it guaranteed him sales commissions of over $1.8 million over three years, and also gave him an interest-free note of $650,000. And after two and a half years of performance, Mr. Tormey had received almost $1.6 million in payments from St. Jude Medical, and during that entire period of time had generated revenues of just less than a million dollars. So the fact of the matter is they were paying Mr. Tormey an enormous amount of money. They had every interest in Mr. Tormey being a successful sales rep, and he was ultimately terminated because he simply was unable to generate the sales that he had represented he would be able to achieve that induced the company to … It's irrelevant, but the enormous amount of money they paid him was minor compared to the enormous amount of money they made off these devices. Well, I guess that was the point, Your Honor, is that they weren't making an enormous amount of money off the devices because they actually paid Mr. Tormey over a half a million dollars more in commissions than he had generated in sales during the entire period of time. How does that stack up with their total assets at that time? I mean, are we talking about a large amount of it, or is this just small change to the company? The $1.5 million? Yeah. I'm sure that it would be very small in comparison to the total assets and net worth of St. Jude Medical, but the point was how … The company wasn't tipping over and just about going into bankruptcy itself as a result of all of this. As a result of Mr. Tormey's failure to perform? No, Your Honor, that, you know, and that wasn't an issue in the case at all. Thank you, Your Honor. Thank you. Mr. Davis, we have about two minutes. Thank you, Your Honor. Just several things. First, consistent with how they briefed it, Mr. Fox is arguing for affirmance on grounds much different than those relied upon by Judge Davis, and he starts making an impassioned argument that there should never have been any finding that there was an oral agreement, notwithstanding the court's assumption that there was. But when he says the record was devoid of any evidence, I think he pushes the facts too far. What the record reflects and what we told the jury was that, you know, beyond Mr. Tormey's unrebutted recollection of the conversations with Mr. Ganst, preceding those conversations by several months were a series of emails he sent the company saying, we really need to change the relationship, here's a number of options I would put on the table, and all the options he presented featured him keeping the $650,000 loan in exchange for changing his position and giving up other rights. So his testimony is that when he talked to Ganst, Ganst was simply ratifying proposals that Tormey had put on the table and about which Ganst had known because he talked to Tormey's other bosses. Beyond that, Tormey clearly honored the noncompete, which would be completely irrational on his part had he not truly believed there was an oral agreement. Then briefly on the counterclaim, Mr. Fox cites to the handwritten notes of the conversations with Accountant Brown. I think the jury draws a different conclusion from those. At trial they tried to suggest that Tormey made up the settlement agreement with St. Jude, but here you have notes from 2007 and before where clearly Tormey is talking with his accountant about a settlement with St. Jude. You can argue about the tax consequences of that, but Tormey's not inventing the settlement if he's having conversations with his accountant about it years before the lawsuit is initiated. Final comment, the 1099s recognize an income event. I think from a tax standpoint it would be plausible for St. Jude either to continue sending those or to send a 1099 saying we forgave $650,000. Either one creates a tax consequence. Okay, thank you, Mr. Ravitz. Well, we will do our best to figure it out and get back to you in due course. So thank you for your arguments and we'll move on to the next case.